# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 11, 2013

## IN RE KELSIE M.P., ET AL.

**Appeal from the Juvenile Court for Knox County**
**No. 114127      Hon. Timothy Irwin, Judge**

---

**No. E2012-02060-COA-R3-PT-FILED-FEBRUARY 12, 2013**

---

This case involves the termination of a mother's parental rights to three children who had been placed in the custody of the Tennessee Department of Children's Services. The mother had made some progress in complying with the permanency plan developed by the Department, but was still experiencing "instability." Nearly two years after the mother relinquished control of the children, the Department petitioned to terminate the mother's parental rights. The trial court granted the petition, terminating the mother's parental rights on the ground that the conditions that led to the children's removal continued with little likelihood of remedy. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, Carrie M. P.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Dorothy Cooley, Maryville, Tennessee, Guardian ad Litem.

## OPINION

## I. BACKGROUND

On January 15, 2010, Susan Raley, the maternal aunt of the children, petitioned the Juvenile Court to find Kelsie M. P. (D.O.B. 1-8-09), Jacob M. R. (D.O.B. 8-23-07), and Alyssa R. P. (D.O.B. 5-26-04)[1] (collectively "the Children") abandoned, dependent and neglected. The petition alleged that the Children were without proper care and supervision because Carrie M. P. ("Mother") had been homeless for an extended period of time and suffered from drug abuse issues. Ms. Raley and her husband had maintained physical control of the Children since January 9, 2010, "when [M]other called and told them to come and get the [C]hildren." Mother brought the Children to the Raleys' home, signed a power of attorney, and left. At a preliminary hearing ten days later, the Juvenile Court awarded temporary custody of the Children to Ms. Raley. Mother did not make an appearance at the hearing.

Mother appeared at an April 30, 2010, hearing, with counsel, and agreed to transfer custody to the Raleys. The parties stipulated and the court found by clear and convincing evidence that the Children were dependent and neglected due to Mother's lack of housing and ongoing substance abuse issues. The Juvenile Court awarded ongoing temporary custody to the Raleys.

A little over a month later, the Guardian ad Litem assigned to the Children made an oral motion for their emergency removal from the Raleys' home.[2] At a subsequent hearing, the Juvenile Court awarded temporary custody of the Children to the Department of Children's Services ("DCS").

The initial permanency plan ("the Plan") was developed on July 8, 2010, with Mother's presence and participation. The Plan required that Mother:

    a. complete domestic violence counseling;
    b. complete a mental health assessment and comply with resulting treatment recommendations;
    c. complete an alcohol and drug assessment, comply with resulting treatment

---

[1] It is the policy of this court to identify the last names of those involved in termination proceedings by initial.

[2] Ms. Raley indicated that she became overwhelmed by the care required for the Children and the impact on her marriage and financial resources.

recommendations, be alcohol- and drug-free, and pass random drug screens to demonstrate sobriety;

d. establish suitable stable housing with no environmental hazards, domestic violence, drug use, or other risks to her children; and

e. complete age-appropriate parenting education and demonstrate learned skills.

Due to domestic violence and criminal issues involving Mother's husband,[3] she was required to separate herself from him unless he, too, completed domestic violence/anger management counseling and addressed other issues of concern. Additionally, Mother was instructed to visit the Children regularly and to pay child support.

At a hearing on July 27, 2010, Mother reported that she had located appropriate housing, taken her GED test, and obtained a job. According to Mother, she had completed an alcohol and drug assessment through Bradford with a recommendation for intensive out-patient treatment, had a car and driver's license, and planned to address the domestic violence issues through individual counseling. The Juvenile Court observed at that time that Mother was in partial compliance with the Plan and that her progress was good. However, within a few weeks she left Knoxville and returned to West Tennessee. A DCS pleading summarizes what transpired next:

> Over the next several months she maintained sporadic telephone contact with [DCS] and attended some of the scheduled visits with [the Children]. She came to Foster Care Review Board on October 6, 2010, and tested positive for benzodiazepines. In mid-December 2010 she reported that she was with her husband, living with her mother, and that they were thinking about moving back to Knoxville.

> On January 6, 2011, [Mother] reported that she and her husband had returned to Knoxville. They were looking for housing and jobs. The [C]hildren's case manager referred them to Knox Area Rescue Mission (KARM) and to public housing. They sought assistance at KARM and entered the New Life Inn program for homeless families. [Mother] worked diligently in this program, eventually separating from her husband. She obtained a job, completed her assessments, and participated in recommended individual therapy and medication management through Solution Source. She passed random drug screens. KARM assured her that she could continue to live there, and that her [C]hildren could join her, but their goal was to find independent housing for

---

[3]He was not a biological father of any of the Children.

her. She knew that she would not be eligible for public housing until September 2011 due to previous criminal charges.

The [C]hildren were returned to [Mother]'s care for trial home placement on May 26, 2011. They continued to live at KARM and she quit her job in order to provide continuous supervision for the [C]hildren and to get Kelsie to all her medical appointments. On July 8, 2011, [Mother] failed a drug screen, putting her continued residence at KARM in jeopardy. A month later she failed another drug screen. She was warned that another dirty screen would result in her discharge from the program. In early August 2011, [Mother] got frustrated with Jacob to the point that she hit him in the head, leaving marks on his forehead. At a Child & Family Team Meeting on August 15, 2011, she said she was very overwhelmed and frustrated, uncomfortable having her [C]hildren at KARM, living in a one-room unit, and having no time alone. She felt that Kelsie required her constant attention and that, as a result, Jacob and Alyssa were not getting the attention they needed. She wanted to find a job, but had no one to help watch the [C]hildren and could not get them into daycare. She also stated that she could not handle it in Knoxville. She proposed to return to live with her mother in West Tennessee and agreed that the trial home placement should be terminated. The [C]hildren returned to foster care that day.

On August 29, 2011, [Mother] telephoned from a Knoxville hotel. She said that she had left KARM and tried staying with a friend but that had not worked out. She was putting in applications for a job and intending to resume treatment at Solution Source. That never happened. Instead, despite actually being offered a job, she left town and went back to West Tennessee. On September 12, 2011, she telephoned and reported that she had returned temporarily to West Tennessee because she did not have suitable housing in Knoxville and her peers had been negative influences. She was advised that the [C]hildren's case manager and the resource agency (Patria) had made repeated efforts to locate her and that she needed to remain in contact. A visit was scheduled for September 15, 2011, but she cancelled it as she did not have transportation. She visited with Kelsie several times at the end of August but has not seen the other [C]hildren since the trial home placement was disrupted on August 15, 2011. She has communicated with the [C]hildren's case manager by t[e]xt message but those messages only confirm that her situation is unchanged. She remains without suitable housing for herself and the [C]hildren and without a stable source of income. She dropped out of therapy and medication management. And she has failed to demonstrate the ability to

provide for the long-term care and supervision of [the Children].

(Numbering in original omitted.).

DCS filed to terminate Mother's parental rights on November 21, 2011, based on the continuing instability issues.[4] DCS ultimately concluded that despite some improvement in her situation, Mother still was unable to provide the care and supervision the Children required.

A bench trial was held on August 29, 2012, at which time the parties agreed to stipulate to the ground of persistence of conditions. The Juvenile Court read to Mother and her attorney the definition of persistence of conditions, DCS asserted that the persistent condition that had required removal and had not yet been remedied by Mother was her instability, and Mother and her attorney individually stipulated to the existence of the ground. DCS subsequently introduced the dependency and neglect proceedings and the documents relating to the disruption of the trial home visit as proof of Mother's instability.

DCS thereafter called Courtney Hamilton, the Children's DCS case manager, to testify that termination of Mother's parental rights was in the Children's best interests. Hamilton noted that at the time of trial, Kelsie was three years old and suffering from severe developmental delays and a cortical visual impairment, severe acid reflux and asthma, and was being tested for autism and cerebral palsy. Hamilton indicated that Kelsie, who requires the use of a walker, is enrolled in a developmental preschool program where she receives physical and speech therapy three days a week. Hamilton testified that Kelsie is currently in a pre-adoptive foster home that includes three older boys who "pick [Kelsie] up and talk to her, and she loves to see them when they walk in the door." According to Hamilton, Kelsie loves her foster mother and father and "fits right in." Hamilton further observed that the foster family has allowed Mother to visit Kelsie at their home and that they have built a relationship with her.

As to Alyssa and Jacob, Hamilton related that they are with a different foster family than their sister. At the time of trial, Alyssa had started the third grade; Hamilton noted that Alyssa has had past issues with stealing and lying, but is improving. Alyssa receives medication management and individual therapy every other week, but she is doing well in the foster environment. Jacob was described by Hamilton as "being physically and verbally aggressive, kind of destructive to property, . . . has a hard time when somebody tells him no or he can't have something that he wants." According to Hamilton, Jacob requires immediate

---

[4]The parental rights of Alyssa's father and the father of Kelsie and Jacob had already been terminated at the time of trial and were not appealed.

structure and stability with consistent consequences for his action. She opined that Jacob's problems with physical aggression and colorful language are because "he's seen things in the past." Like Alyssa, Jacob also receives medication management and individual therapy. Hamilton testified that due to the foster mother's health issues, Jacob and Alyssa's home was no longer pre-adoptive. However, she opined that Jacob and Alyssa would be easily placed in a new pre-adoptive foster home.

After hearing the proof, the Juvenile Court terminated Mother's parental rights to the Children based upon the ground of persistence of conditions. The court determined that the parties had stipulated to the ground of persistent conditions and independently found that termination was in the Children's best interests. Mother filed a timely notice of appeal.

## II. ISSUES

We restate the issues raised by Mother as follows:

a. Whether the trial court properly determined that Mother failed to remedy the persistent conditions in her life that prevented reunification with the Children.

b. Whether DCS sufficiently established that it made reasonable efforts to reunify Mother with the Children.

c. Whether the trial court properly determined by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interests.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B.*

*v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C. W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions

regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV. DISCUSSION

### I.

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

**36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

\* \* \*

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

-8-

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

Tenn. Code Ann. §§ 36-1-113(a) - (g)(3)(A)-(C) (Supp. 2012).[5] The party petitioning for termination carries the burden of proof. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). The requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

At trial, Mother purported to stipulate that grounds existed to terminate her parental rights – indeed, she stipulated that her instability was the cause for removal of the Children and the reason why they could not be returned to her custody. The proceedings in the trial court transpired as follows:

THE COURT: The State said that you are willing to stipulate to the ground of persistence of conditions. In an abundance of precaution, I'm going to read

---

[5]Recent amendments have not modified provisions applicable in this case.

you that ground, and I'm going to read it to you as they pled it, and I'm going to ask if you're willing to stipulate to the ground, okay, so we can get it on the record.

That the [C]hildren have been removed by order of the Court for a period of six months, the conditions which led to their removal still persist, other conditions persist which in all probability would cause the [C]hildren to be subjected to further abuse and neglect, which therefore prevents the [C]hildren's return to the care of [Mother]. There is little likelihood these conditions will be remedied at an early date so that these [C]hildren can be returned to [Mother] in the near future. The continuation of legal parent and child relationship greatly diminishes the [C]hildren's chance of early integration in a stable, safe and permanent home.

What specific conditions are you talking about?

MS. KOVAC: Your Honor, the conditions that led to removal included substance abuse, which has been resolved, and instability, and we would assert that that is a condition that has not been resolved.

THE COURT: Do you understand?

[MOTHER]: Yes, sir.

THE COURT: Are you willing to stipulate to that ground?

[MOTHER]: Yes, sir.

THE COURT: Say it out loud.

[MOTHER]: Yes, sir.

* * *

Mother now argues that the Juvenile Court failed to include in its final order findings of fact and conclusions of law sufficient to support a finding that grounds existed to terminate her parental rights. Relying upon the holding of the Tennessee Supreme Court in *In re Angela E.*, 303 S.W.3d 240 (Tenn. 2010), Mother posits that while parties may

-10-

stipulate[6] to the existence of certain facts in a termination of parental rights proceeding, parties are not permitted to stipulate that a statutory ground exists without presenting sufficient evidence into the record to establish the existence of the ground by clear and convincing evidence. *Id.* at 253-255. As noted by Mother, even when termination proceedings are uncontested, "the trial court must develop an evidentiary record, ultimately resulting in a written order with findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [the parent's] parental rights." *Id.* at 255. She asserts there is insufficient evidence to support a finding of persistence of conditions (instability). Mother further contends that the evidence of record supports a determination that the older children, Alyssa and Jacob, may have a better shot at early integration into a safe, stable and permanent home if they are reunited with Mother, since their current foster home was not pre-adoptive.

The Juvenile Court's order provides, inter alia, as follows:

> The parties stipulate and the Court, therefore, finds that the [C]hildren have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the [C]hildren to be subjected to further abuse and neglect and which, therefore, prevent the [C]hildren's return to the care of [Mother]; there is little likelihood that these conditions will be remedied at an early date so that these [C]hildren can be returned to [Mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the [C]hildren's chances of early integration into a stable and permanent home. The parties agree that substance abuse is no long a significant issue but stipulate that [Mother] has not been able to establish stability for herself and her [C]hildren despite the additional time inadvertently allowed through the several continuations of this matter.
>
> [Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [C]hildren's best interest to be in her

---

[6]In *Allman v. Allman*, No. M1997-00251-COA-R3-CV, 2000 WL 1728339 (Tenn. Ct. App. Nov. 22, 2000), this court noted as follows:

> Generally speaking, the "facts" in a case are occurrences and events that happen in the world outside the courtroom, which must be proved through the introduction of competent evidence. . . . Stipulations are not evidence, but they have the effect of making it unnecessary to prove the agreed-to facts with evidence.

*Allman*, 2000 WL 1728339, at *1, n. 1 (internal citations omitted).

home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. She has not maintained regular visitation with the [C]hildren since they entered foster care, abandoning them for months at a time and then returning to resume contact. She has failed to demonstrate the ability to care for her [C]hildren on a long-term basis. A change of caretakers and physical environment is likely to have a detrimental effect on the [C]hildren's emotional, psychological and medical condition.

Kelsie functions at the level of a nine-month old and has extraordinary medical needs. She requires constant attention. Her foster parents are uniquely suited to care for her and she has made significant progress in their home. They have established a positive relationship with [Mother] that everyone anticipates will continue. Adoption in their home will occur as quickly as possible following conclusion of these proceedings. Jacob and Alyssa are in a separate foster home. Their foster mother recently experienced serious health problems and, as a result, concluded that adoption is not a possibility. The [C]hildren have been thriving in that home. It is clear from their behavior there and while on respite elsewhere that they need definite structure, consistent consequences, and a safe, stable and secure environment to overcome their previous experiences. Jacob, at just five years of age, has a vocabulary of profanity and attempts to resolve his conflicts and frustrations by hitting. Another move for these [C]hildren will certainly be a set-back but it cannot be helped. The [C]hildren's case manager testified that she has no doubt a suitable home can be identified quickly once the [C]hildren are free for adoption. They will remain in the current foster home until then. [Mother] has been offered the unusual opportunity to participate in the selection process.

* * *

The Department of Children's Services has made reasonable efforts toward achieving permanency for these [C]hildren.

It is, therefore, in the best interest of [the Children] and the public that all of [Mother]'s parental rights to these Children be terminated and the complete custody, control, and full guardianship of the [C]hildren be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

* * *

-12-

(Headings and numbering in original omitted.).

It is commendable that Mother has made great strides in resolving her issues with drug abuse. However, she still has failed to remedy her issue with instability, preventing the permanent return of the Children to her. A report prepared for the Juvenile Court reflects that Mother stated that she is unable to safely and appropriately care for the Children, and that the Children are too much for her to handle. Indeed, after being permitted by DCS to regain custody of the Children on a trial basis, Mother's instability resurfaced, resulting in a suspension of the trial home visit. We therefore agree with the Juvenile Court's conclusion that DCS has shown, through clear and convincing evidence, that, pursuant to Tennessee Code Annotated section 36-1-113 (g)(3), the conditions that led to the Children's removal continue to persist and prevent the Children's return to Mother, that there is little likelihood that the conditions will be remedied in the near future, and that the continuation of the parent-child relationship greatly diminishes the Children's chances of being placed in a permanent home.

## II.

The General Assembly has recognized that children should not be separated from their parents unless separation is necessary for the children's welfare or in the interest of public safety. Tenn. Code Ann. §§ 37-1-101(a)(3), 37-2-401(a). "Even after a child has been validly committed to the custody of [DCS], the State's first priority is to restore the family unit if at all possible." *In re Drinnon*, 776 S.W.2d 96, 99-100 (Tenn. Ct. App. 1988). To that end, DCS must submit an affidavit to the court in every proceeding where the child's placement is an issue certifying that it has made reasonable efforts to reunify and restore the family. *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *8 (Tenn. Ct. App. March 9, 2004). Tennessee Code Annotated section 37-1-166(g)(1) defines these reasonable efforts as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). DCS's efforts must be reasonable, but are not required to be "herculean." *In re Georgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006). However, DCS need not shoulder the burden alone. The parents "must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required the removal of the children." *In re Q.E.*, 284 S.W.3d 790, 800-1 (Tenn. Ct. App. 2008). The State has the burden of proving by clear and convincing evidence that its efforts at reunification were reasonable under all the circumstances. *See In re C.M.M.*, 2004 WL 438326, at *8.

To determine whether DCS made reasonable efforts at reunification, a court should consider, among other things,

-13-

(1) the reasons for separating the parent from his or her child or children,

(2) the parent's physical and mental abilities,

(3) the resources available to the parent,

(4) the parent's efforts to remedy the conditions that required the separation,

(5) the resources available to the Department,

(6) the duration of the parent's remedial efforts, and

(7) the closeness of the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the Department's efforts.

*In re C.M.M.*, 2004 WL 438326, at *7.

Mother asserts the record in this case is devoid of any testimony regarding what reasonable efforts at reunification were made by DCS. She further notes that she did not stipulate that DCS made reasonable efforts to reunify her with the Children. Mother does not elaborate regarding what else DCS could have done on her behalf.

From our careful review of the record, we find that it supports, by clear and convincing evidence, the Juvenile Court's finding that DCS presented sufficient evidence regarding its reunification efforts. DCS provided Mother with visitation, mental health assessments, mental health counseling, alcohol and drug assessment, domestic violence treatment, and housing referrals. DCS assisted Mother's homelessness and stability issues by working with the Knox Area Rescue Ministries and the New Life Inn program to ensure that Mother would not be asked to leave as long as she followed program rules. After putting these services in place, DCS attempted to return the Children to Mother as part of a trial home placement to see if she could provide a stable environment for the Children. Unfortunately, despite DCS's services and the trial home visit, Mother was unable to remedy the instability that prevented her from being able to adequately parent the Children. Accordingly, from our review of the record, we find that it supports, by clear and convincing evidence, the trial court's findings of fact and conclusions of law that DCS made reasonable efforts to provide Mother with the services she needed to be reunited with the Children.

-14-

## III.

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the Children. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or

controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2010). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Mother argues that the evidence regarding the circumstances of the Children in foster care was very sparse. She contends that the evidence presented is not clear and convincing.

Again, we applaud Mother's accomplishments regarding her drug abuse issues. However, our review of this matter reveals that Mother has failed to make a lasting adjustment despite the best efforts of DCS to provide her services. *See* Tenn. Code Ann. §§ 36-1-113(i)(2) & (8). Mother also failed to make an adjustment of circumstances, conduct, and conditions to make it in the best interests of the Children to remain in her home. *See* Tenn. Code Ann. § 36-1-113(i)(1). A report prepared for the Juvenile Court reflects that Mother declared that she is unable to safely and appropriately care for the Children, as the Children were too much for her to handle. At the time of trial, Mother still had not obtained stable housing fit to care for the Children. Thus, despite the lengthy period of time away from the Children that Mother has had to "get her act together," she still cannot provide a stable environment for the Children. Likewise, the Children are doing well in foster care and would suffer emotionally should they be removed. *See* Tenn. Code Ann. § 36-1-113(i)(5). Given the evidence showing Mother's inability to parent and provide for the Children and the Children's need for permanence, the Juvenile Court properly found that the termination

of Mother's rights was in the best interest of the Children. We conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellant, Carrie M. P.

_____
JOHN W. McCLARTY, JUDGE